Good morning, Your Honors. John Echevarria for the Appellant Defendant Xavier Becerra, the Attorney General of California. I'm intending to use three minutes of my time for rebuttal. Okay. Go ahead. The evidence in this case shows that California's reasonable ten-round- You don't have a really loud voice, so if you can raise it just a bit, that might be helpful. I will do my best, Your Honor. Thank you. The evidence in this case shows that California's reasonable ten-round limit on magazine capacity is related and furthers the government's important public safety interests in mitigating the lethality of mass shootings and gun violence against law enforcement. And at the same time, California's limit of ten rounds per magazine accommodates the self-defense interests of law-abiding citizens, as this court previously determined in FIOC v. Sunnyvale. The record in this case is substantially similar to the record in FIOC. It involves many of the same expert witnesses, social science data, and government studies, which this court held is precisely the kind of evidence that the state can rely on under intermediate scrutiny to show a reasonable fit. This court should follow FIOC and join the six other federal circuit courts that have unanimously upheld substantially identical ten-round limits on magazines. And with respect to plaintiff's takings claim, Proposition 63's ban on the possession of large-capacity magazines is not a confiscatory measure. It is not a per se taking. Let me ask you this, counsel. The state relies heavily on FIOC v. Sunnyvale to argue that intermediate scrutiny applies. But unlike the law in FIOC, Section 32.310 lacks any exception that would allow citizens to keep, I'm going to call them LCMs, large-capacity magazines, for use with lawfully owned weapons that operate without LCMs. In effect, any normal citizen with these weapons can no longer use them to protect themselves at home. This seems to be quite a severe burden on the core Second Amendment right. Why shouldn't that trigger strict scrutiny and distinguish itself from FIOC? Well, Your Honor, there's no evidence in the record that there are any weapons in the state of California that require a large-capacity magazine to operate, including operating in a home for self-defense. So while Your Honor is correct that Sunnyvale did have an exception for firearms that require a large-capacity magazine, in the record before the court, there just aren't any firearms that require large-capacity magazines. And according to the declaration of Blake Graham, who's a Department of Justice special agent, California has available for lawful possession magazines that hold 10 rounds or less that can be used in semi-automatic firearms for self-defense. So in effect, just like the regulation in Sunnyvale, California is restricting a subset of all magazines. And those magazines themselves are used in a subset of firearms, semi-automatic firearms. But those magazines, those larger-capacity magazines, according to the record, account for almost half of the magazines in the United States. And they are regularly used in handguns, the Glock 17 or the Beretta. And these are the staples of self-defense. So why doesn't that impose substantive burden if it restricts half the magazines in America, especially when they're used for guns that are typically used for self-defense? Because there are alternatives, magazines that hold 10 or fewer rounds, that are effective for self-defense. But did the Supreme Court essentially bar that argument in Heller where the D.C. said, well, yes, we ban handguns, but there are alternatives. You can have long arms. And the Supreme Court said that's no answer just because you have alternatives because we don't do that with any other constitutional right and say, well, you have an alternative. So why is that argument barred by Heller? So Heller concerned the quintessential self-defense weapon, the handgun. And the court didn't just find that the handgun was the quintessential self-defense weapon based on the number of handguns that are out there. It also looked at the core attributes of handguns that made them very useful for self-defense. And the record here shows that the attributes for large-capacity magazines are not for self-defense. Large-capacity magazines were designed for military applications, to fire as many rounds as possible, to kill and disable as many enemies as possible in the battlefield. But there's evidence that people at home, if you have a home invasion, that it doesn't necessarily mean that as a homeowner that you're, number one, a great shot, and number two, that it's only going to be one person involved in the home invasion and that you're only facing one gun. So I think that there seems to be some evidence that people need more than a few bullets sometimes to defend themselves in the home. That may be the case. The record does show that on average, when a firearm is used for self-defense in the home, and this was based on evidence that the court credited in FIOC, and that would be the expert opinion of Lucy Allen, on average about 2.2 rounds are fired. That's an average, so there may be some circumstances where more than two rounds need to be fired. California's law sets the maximum capacity at 10 rounds, which is far above the average. Well, except there are a lot of firearms that, you know, the common firearms for self-defense, a lot of them have 17, 14, 16, any number of those. And so when you just decide to pick 10, then next time if we say that's okay, you come back and you say, well, now we only think you need five. And then we only think you need, I don't know how you do 2.7, but so maybe you'd round up to three. So it sounds like a pretty slippery slope, whereas if you look at the weapons that we have out there that are self-defense, the ones that have been commonly used and what the magazines are, 10 seems to be sort of a random choice. So the weapons that Your Honor refers to can operate with magazines with 10 or fewer rounds. And those weapons are possessed in the state of California, and they can use California-compliant magazines. And I just want to make clear there is a limiting principle in the state's position here, and it's the same limiting principle that the First Circuit seized upon. We are dealing here with a 10-round limit. If there is some lower limit that's imposed by a jurisdiction, then the court will have to engage in the part of the second-step analysis concerning the severity of the burden to determine whether the limit is too low. And there may be some threshold. The record doesn't identify necessarily what that threshold is. Let me ask you. I think Judge Lynn had a question maybe, and my mouth opened a second before. Did you have a question, Judge Lynn? No, no. Go ahead. Okay. So there may be some limit that is too low and does actually impose a severe burden on the core right of self-defense  And then that would trigger some form of... Obviously, having a firearm and having zero would be too low. You would concede that, right? The court in Jackson seems to make clear that there is some right to magazines that are necessary to operate firearms. So if a magazine limit is set at zero, then I guess a semi-automatic firearm would only be able to fire the round that's chambered. So that would be a one-round shot. I think that might be too low. Well, hypothetically, if we were to conclude that strict scrutiny applies, I'm saying hypothetically because I don't know. We haven't conferenced, and so I'm just asking for the hypothetical. How have you shown that Section 32310 is the least restrictive means to achieve the state's compelling interest? Let's assume that you have a compelling interest here. Sure, Your Honor. So the evidence shows that large-capacity magazines enhance the lethality of semi-automatic weapons when they're used, particularly in public mass shootings, to more fatalities, more injuries. And that evidence is based on expert reports that are in the record, the evidence that has been cited in other cases, the six other federal circuit cases that came to the same exact conclusion. And the reason why California's loss would satisfy strict scrutiny,  and because of the decisions of the six other federal circuit courts. But if strict scrutiny does apply, there is a close fit between a 10-round limit and the state's compelling interest. No one disputes that the public safety interests that have been identified by the state are actually compelling. So that part of the strict scrutiny analysis is satisfied. And regarding the fit, there is tailoring, because even legally owned large-capacity magazines can be used in public mass shootings. It can be stolen and used in crime. And this can be seen in the expert report of Lucy Allen, where she noted that according to the 96 public mass shootings that she examined, 71% of the shooters acquired their guns illegally. And 76% of the firearms used in those shootings were acquired illegally. I want to talk about... Go ahead. The trial judge seemed unimpressed with much of the factual record that the state presented. Are we just starting over again and reevaluating the factual record here without giving any credit to the trial judge's assessment of the power of the evidence that you presented? That's correct, Your Honor. This court is reviewing the law de novo, and it doesn't owe any deference to the trial court's evidentiary determinations which is in stark contrast to the standard of review in the prior interlocutory appeal that was reviewing the district court's preliminary injunction for abuse of discretion. Here, the court is taking a fresh look at the evidence, but the court is not approaching that evidence with a blank slate. In FIOC, the court held that the very evidence presented here, and the records are substantially similar... Wasn't FIOC an abuse of discretion review? It was, but there were legal... So, I mean, I'm trying to figure out in terms of that, obviously, you know, that word is FIOC keeps flying out of your mouth, and obviously that in terms of if that is... You know, we are bound by other three judge panels if, in fact, it covers our area. Now, on the other hand, it was abuse of discretion there. Here we're de novo, and there are some factual differences in the law as far as that goes. So, I mean, I could envision a situation where I would say under abuse of discretion in FIOC that the court did not abuse its discretion, but where I'm analyzing de novo, that FIOC does not stand for the proposition that intermediate scrutiny is the only way we can look at it. Can you help us there? Sure. So, in FIOC, the court did make binding legal determinations. Number one, that a 10-round limit is not a policy option that is... Well, you probably need to be careful, too, because Judge Lynn was on that, I believe, so... I was. Tell me what she said. There are two people on this call who were there. Yes, yes. You both will keep me honest. Thank you, Your Honor. So, first, a complete... First, the FIOC court rejected the argument that a 10-round limit is a policy option that is off the table under Heller, and the court also agreed with the district court's determination that intermediate scrutiny applies, and it didn't apply because of some particular provisions in Sunnyvale's ordinance. It applied because there were alternative channels that did not obliterate the ability for law-abiding citizens to protect themselves, and that's the reason why intermediate scrutiny applies. And the court stated it agreed that intermediate scrutiny applies to a 10-round limit consistent with the determination of the District of Columbia Circuit in Heller, too. So, what are the alternative channels here?  Californians can acquire any number of magazines holding 10 or fewer rounds for self-defense, and the record indicates that those magazines can be used in a range in most, if not all, firearms in the state of California. And the record also shows that large-capacity magazines are not particularly suitable for self-defense. The First Circuit in Warman analogized the use of a large-capacity magazine for self-defense to using a sledgehammer to crack the shell of a peanut. Even in self-defense situations, a large-capacity magazine can pose a danger to others. Well, guns pose a danger to others. You know, they kill people. So, what evidence in the record demonstrates the extent to which LCMs that are lawfully owned by law-abiding citizens end up being used in mass shootings or other gun crimes? What's the evidence on that? So, I would point the court to Lucy Allen's expert report, which I discussed previously, which found that 70% of individuals who become public mass shooters acquired their firearms legally, and in 56% of the mass shootings analyzed by Lucy Allen, large-capacity magazines were used.  So, that is why California cannot have a more narrowly tailored restriction just to large-capacity magazines used in public mass shootings. Was there conflicting evidence on that point? Is there conflicting evidence in the record on that point that you just made, and did Judge Benitez credit other evidence on that? I think that goes back to Chief Judge Lynn's question about if there were factual determinations in the record made, can we really start over on those factual determinations? I'm not aware of any evidence that contradicts the opinions of Lucy Allen. The criticisms of Lucy Allen were focused on her partial reliance on the list of public mass shootings compiled by Mother Jones. But I'm not aware of any conflicting evidence. But I would also note that even if there is conflicting evidence, this court in Jackson held that conflicting evidence while not doing a statute under intermediate scrutiny in Jackson. Based on the record before us, in terms of mass shootings in California, I think they cited 17. And 14 of those 17 mass shootings, the perpetrator used multiple guns at the shooting. Given that, suppose that state of California passes a law saying there's a limit of one gun per housework because if someone has access to more than one gun, there's a chance it may be used in a mass shooting. Would that type of law limiting one gun per household pass constitutional muster? I can't answer that question directly, Your Honor. I think that there's a possibility that that could trigger heightened scrutiny because there would be a greater burden on the core self-defense right. But under your reasoning, there's alternative channels. The person has a handgun or some other gun and can defend himself or herself. So under your theory, why would a law limiting one gun per household pass constitutional muster? Well, I don't know, Your Honor. I think that that law would be much more burdensome than the law that we're analyzing here. So I would hesitate to say that it would be subject to intermediate scrutiny. And it would also involve substantially different evidence. Well, what if my husband and I each want a gun? So then we have to share one and decide who gets to shoot? And then by then, we've been shot? Well, Your Honor, I understand that there is the possibility that other restrictions of the use of firearms in the home can impose different types of burdens. There are storage requirements. We're not dealing with a limit on the number of firearms that can be owned. But there is a possibility that some heightened scrutiny would apply. But here, with a 10-round limit, where individuals can own as many 10-round magazines as they want and store them and make those magazines accessible in the home in a way that they feel comfortable with, in a way that they feel will enable them to effectively defend themselves, that does not severely burden the core Second Amendment right. Well, how would that be different? Because a lot of times, people have more than one magazine, okay? So if you can only have a 10-round magazine, as opposed to, say, the gun was made to have 17, let's say. So you modify it and you have the 10. Can you have more than two 10-rounds? So let's say you have, I mean, you see people, they have several magazines. So what's the magic of putting it to 10 if you could have three 10s set up there? Because under this law, you could? You can have as many 10-round magazines. And that's another point, that an individual can fire more than 10 rounds. They'll just have to reload. But the reason why the state has decided to break up the number of rounds per magazine is that we want to require as many pauses in mass shootings as possible. These pauses save lives. They save lives in Vegas. They save lives in Thousand Oaks, as the record shows. They save lives in Tucson when the shooter was attacked. So wasn't there some record, though, about that a lot of these mass shooters don't even shoot very fast? I just, I remember reading something along those lines to say that they're taking longer in terms of shot, shot, shot. You know, they're not, and so the pauses really are not, are really, there isn't, it's not, the evidence isn't uncontroverted that the pauses really make a difference. Well, even if it is controverted under intermediate scrutiny, the state is entitled to net points. But that, I believe Your Honor is referring to some research conducted by Gary Kleck, who's one of plaintiff's experts. That particular research has been subject to significant scrutiny. There were many mass shootings that occurred in multiple places, and he totaled the total time and then averaged out the time per shot, which produced completely incredible results. I see that I'm running significantly out of time. Well, you're okay, because we're asking you questions. You're okay, and I'll give you your time. I have a question about, if we were to affirm the district court on the Second Amendment grounds, do we need to address the takings issue? No, you would not. The Second Amendment claim covers the entirety of Section 3310. So, it's, why doesn't Section 32310's complete ban of LCMs without compensation rise to the level of either a physical or regulatory taking under the takings clause? That's great, Your Honor. I wanted to address the takings claim. Well, we'll let you do it. You don't have to use it on rebuttal, okay? I appreciate it. Thank you. Section 63's ban on the possession of large capacity magazines is not limited to grandfathered magazines. It also bans the possession of new magazines. So, subsection C of Section 32310 should not be enjoined under the takings clause. But even looking at grandfathered magazines, plaintiffs are focusing their argument on the per se physical takings theory, which was the same theory issued in foreign. They effectively abandoned the regulatory takings claim because the courts have not applied a regulatory takings theory. Well, but wait, let me, on 13, but if I understand 32310, if I have a large, let's say I have a Sig Sauer that has, it's 17, or what, a 17 magazine, or I don't know, 14 to 17 it says. If I have a Sig and this law is upheld, am I not, even though I already have that, and when I bought it, it's legal, wouldn't it become a crime if we uphold this? Not necessarily, Your Honor. There is an option in Section 16740 that would allow you to modify that magazine. Well, no, but I couldn't keep it just the way it is. If I keep that 17 round magazine that came with the gun when I purchased it, I'd be committing a crime, right? You would be deciding to keep the magazine in its original state, and that would be a violation of the penal code. So it isn't a grand fine that way, because in FIOC, and the same thing in FIOC, I could have kept it, right? In FIOC, there were disposal options. The FIOC statute was substantially identical to Prop 63. There was no takings claim asserted in that case, though. I know, but in FIOC, if I had lawfully, if I got the 17 magazine with the gun when I purchased it, FIOC would not take that magazine away from me and make it criminal, would it? The FIOC possession ban would have required you to dispose of the magazine by delivering it to a dealer, delivering it to law enforcement for destruction, and there also is the 16740 definition that would allow you to modify it. But you would not be compelled to hand over your property to the government, and that's the key distinction. Horn required the raisin growers to hand over their property to transfer ownership, and with large capacity magazines, the way that California regulates them, individuals can keep ownership of the magazines and use them in firearms for lawful purposes, and that retains the core function of the magazines as a feeding device for semi-automatic weapons. Well, is there an issue about the gun owner having to pay for this modification that is implicated by the takings clause? Because if you want to keep your weapon that has magazines in excess of 10, you have to have that magazine modified by a gunsmith, and that incurs a cost. Is that relevant to the takings issue? That would not be relevant to the physical takings issue unless theoretically the cost is, you know, some astronomical number where it's impossible to modify the magazine. But in Appellant's excerpts of record, page 1920, the California Rifle and Pistol Association represented to the attorney general by letter that it's relatively easy to modify, to permanently modify a magazine. But there is no evidence in the record as to how much a modification would cost, but it doesn't seem to be an owner's burden on owners of large capacity magazines to modify them. At a gunsmith. But with respect to a regulatory takings theory, which again, it seems that the plaintiffs have abandoned, that does not rise to a taking. The Lucas theory of total reduction of beneficial use and production of property, that wouldn't apply. Individuals would still have their magazines. They would just have to pay to modify them. And then regarding a Penn Central regulatory takings theory, there's no evidence in the record as to what the economic burden would be on owners of large capacity magazines, or what their investment expectations were. So would it be, so if, let's just say, on that issue, if we reached it, would it have, in your view, would it have to be, the district court's, the district court, it was a little bit cursory, much more cursory on the takings and the evidence on that. Would it need to be remanded for development of a record? It would not, Your Honor. The plaintiffs never asserted a Penn Central takings claim. There were references to a regulatory takings claim, but as a matter of law, courts have not applied the Fifth Amendment takings clause to personal property. And the idea is that when individuals have personal property, there's some reasonable expectation that the government may regulate it in the future, and that's especially the case in a highly regulated industry or area of the law, which firearms clearly are, in the state of California and nationally. And regarding... Okay, let me find out, do either of my colleagues have any additional questions at this point? No. Okay, I think we've gone quite a bit over,  Thank you. Thank you, Your Honor. Good morning. Good morning. Can everybody hear me okay before I start? Yes, but keep your voice up. Will do. Thank you. Give your outside voice, loud. Okay. Good morning, Your Honors, and may it please the court, Erin Murphy, on behalf of the appellees. The district court correctly concluded that California's so-called large-capacity magazine ban violates both the Second Amendment and the takings clause. What the state has labeled large-capacity magazines plainly satisfy the test that Heller articulated for determining whether something is protected by the Second Amendment, because there are tens of millions of these magazines with a capacity of more than 10 rounds owned by law-abiding citizens for lawful purposes. Because these magazines are protected by the Constitution, the state can't flatly prohibit them. Even intermediate scrutiny demands a reasonable fit. To use the words that the Supreme Court has most recently used in articulating what intermediate scrutiny demands, the state must prove that a law is narrowly tailored to serve a significant governmental interest. Let me ask you this, since, obviously, the district court went on strict scrutiny and intermediate scrutiny, and we spent a lot of time with the counsel for the appellant on FIOC. And so my question is, because we do have a three-judge panel, we're bound by Ninth Circuit precedent that requires us that we apply a framework established in, we've got Jackson versus the city of San Francisco, and then we also have FIOC. And so my question is on those. What do those cases, how do they tie our hands? Because we're not sitting on bonk, and so how do those cases affect the standard of review that we apply? Sure, I don't think they tie your hands here. The only one of those cases that dealt with the question of whether you can outright prohibit something that is protected by the Constitution is FIOC. And I think that FIOC, I mean, the opinion begins with a lengthy discussion of how it's an opinion that's on a preliminary injunction and that it is not resolving the ultimate question. And the opinion does, you know, more than a dozen times use the phrase abuse of discretion as to pretty much everything it's talking about. So I don't think FIOC needs to be read as compelling the conclusion that you have to apply intermediate scrutiny here. But I will say, I ultimately don't think it makes a difference, because even under intermediate scrutiny, fit matters. That's what the Supreme Court has instructed, and it's certainly not something this court can deviate from. And fit means that you have to look not just at whether the law furthers the interest the state is asserting, but whether it furthers in a manner that doesn't unnecessarily abridge more constitutionally protected activity than necessary. And if you accept the premise, as I think you have to do, that these magazines are protected by the Second Amendment, then flat-out prohibiting them is just, you know, it's the exact opposite of a fit. You don't narrowly tailor or even remotely tailor a law by saying we'll just take all the constitutionally protected conduct off the table. So I think, you know, even if your hands were tied as to the standard of review, they're not tied as to the application of that standard review and the ultimate determination that the law fails either way. Do you concede that the state has a compelling interest here? I mean, do we need to bother ourselves with that? I mean, I think the bench beneath it is important or whatever, but is, I mean, can we jump over that and just say the state's got a compelling interest? Yeah, I think that's fair. You know, I think there's ways the state might articulate its interest that we might take issue with, but we don't dispute that, you know, that there's a compelling interest in protecting the safety of Californians and in trying to reduce gun violence and in trying to decrease the lethality of mass shootings when they do occur. We don't dispute that those are important or compelling interests. What we take issue with here is whether the means the state has chosen are means that are appropriately tailored to serve that interest and do so without unnecessarily abridging more constitutionally protected conduct than necessary. Do you concede that there is a level of a large-capacity magazine that could be prohibited? Let's talk about a hundred rounds. Do you concede a level at which an absolute prohibition is constitutional? I would concede that there is, you know, that there is a level. I think the right way to analyze that, I'm not kind of here to tell you what I think kind of the platonic number is. I think what you would do is whatever number is chosen by the state, you engage in the analysis that Heller articulated of asking, is this something that's typically possessed by law-abiding citizens for lawful purposes? And a record would have to be developed on whatever number is selected by the jurisdiction, but it stands to reason that there is going to be some number at which you no longer satisfy that test and you're dealing with something that's not within the scope of the test that Heller articulated for what is protected by the Second Amendment. But I think the right way to answer that question is by applying that test and asking whether something is typically possessed by law-abiding citizens for lawful purposes rather than saying, well, yes, it's within the scope of the Second Amendment, but do you really need that many rounds or that kind of firearm, you know? And I think it's particularly telling here that, I mean, you know, the state has a footnote in its reply brief saying just to make clear, we don't even think 10 is constitutionally protected, and I seem to have heard counsel today not even willing to concede that a one-round limit would be unconstitutional. So, and I think that's really a consequence of if you don't take seriously the notion that the test should focus on typically possessed by law-abiding citizens for lawful purposes, then you end up with no limiting principle. You end up with the state saying... So is the evidence for you on that point that over half of the magazines that law-abiding citizens possess are of greater LCMs? Is that what... Yeah, I mean, there's, you know, there's a few different metrics. I mean, you know, there's... I really don't think anybody disputes that it's well over half, there's tens of millions, perhaps over 100 million. You know, every court that has applied the commonly possessed test has agreed or found it very easy to assume without deciding that whatever the limit may be, it can't be 10 because it's just absolutely clear that, you know, by sheer numbers and by the amount of magazines that are purchased. Also, as Your Honor noted, you know, there are many firearms that come standard with magazines with a capacity of more than 10 rounds. There's some that come only with capacities of more than 10 rounds. So wherever that number is, you know, 10 can't be the limit. And I think it's worth... But in the example that you gave, most of these are sold with the firearms as standard equipment. So I think the evidence is lacking that there is a material number of people that go out into the marketplace independently of buying a handgun and buy large capacity magazines. I may have missed that in the record. Give me a site that tells me that. Sure, yeah. No, I think if you go to... I'm looking here for the particular expert report that we have on the statistics of ownership. I think it is from Dr. Coper's report in the record. But it's actually statistics as to magazine purchases, not firearm purchases, that well over half the magazines that have been purchased over the past couple decades have been magazines that are capable of... with a capacity of more than 10 rounds, not just that the firearms that have been purchased are ones that have a capacity of more than 10 rounds. And again, I don't take the State to dispute the proposition that they certainly haven't argued in their briefing before this court that if the tests were commonly possessed by law-abiding citizens for lawful purposes, that nonetheless something... that this wouldn't satisfy that test. I mean, they've instead articulated an argument that this court should apply a completely different test. And they've urged the court to embrace the test that the Fourth Circuit applied in the Colby case where instead of asking whether something is typically possessed for law-abiding purposes, the court said, is it something that's most useful for military service? And with all due respect to the Fourth Circuit, I think that that test is just flatly contradictory to what Heller says. You know, Heller makes very clear that what it juxtaposes are firearms that are commonly possessed for lawful purposes with firearms that are dangerous and unusual. And the ones that are outside the scope of the Second Amendment are ones that are both and, you know, you can... If intermediate scrutiny applies, what's the precise test we use? Because if you look at our court's case law on Second Amendment cases, they've applied intermediate scrutiny, but the formulation has been different. And so, for example, some courts have cited the term of the FCC case and says that we have to give deference to the predictive judgments of legislature. Others have used other language. So what's the test we should use here in this case? So, you know, I think that the predictive judgments piece of the test is really more a test about asking how you credit the state's evidence. I think the ultimate question, the legal question that has to be asked. For that, I would look to the guidance of the three times over the past decade that the Supreme Court has instructed what intermediate scrutiny requires. In McCutcheon, in McCullen, and in Packingham, the Supreme Court applied intermediate scrutiny and said the test is narrowly tailored to serve a significant governmental interest. And I take, you know, while this court has had plenty of cases that talk about how you should, how much deference the state's evidence and predictive judgments should get, none of that really changes that no matter how, you know, what evidence the state puts on, the test it has to satisfy is demonstrating that the law is narrowly tailored to further that significant government interest. And what narrowly tailored means is not, as, you know, counsel for the state here has said today, is it, does it kind of get at the problem. Tailoring is about does it get at the problem in a way that isn't overly restrictive of constitutional rights, to use the language from McCutcheon, an intermediate scrutiny case. Does the law not unnecessarily abridge constitutionally protected activity, more constitutionally protected activity than necessary? Now, a law that tries to address, say, mass shootings by coming up with a, you know, by looking at how do we determine who is not able to get firearms? How do we ensure that we have a more comprehensive database for determining mental health issues and appropriate ways to, you know, to look for warning signs  ensure that firearms aren't in the wrong hands. That's a law that is both targeted at the problem and targeted at the problem in a way that isn't designed to unnecessarily abridge the rights of law-abiding citizens to continue to possess arms that are protected by the Constitution. And to me, that's the basic problem with the state's law here. No matter what level of heightened scrutiny you're applying, you know, it's that same problem that the District of Columbia had in Heller, which is, if this is something protected, then there's lots of things, you know, that no one disputed that the District of Columbia had a compelling interest in trying to decrease criminal use of handguns. But the one option that was off the table is just outright prohibiting law-abiding citizens as well from possessing handguns. And I do think that same reasoning is the appropriate reasoning to apply here. That's the reasoning that multiple members of the Supreme Court have said is the right way to look at it. It's the reasoning that dissenting judges have employed in the decisions addressing this issue, which just, by the way, I would take issue. They are certainly not unanimous opinions. The six courts that have addressed this issue, there have been multiple judges who've disagreed with the way that the majority resolved this issue in other circuits. So I do think that's the right way to look at this issue, and I think it's entirely open to this court under Ninth Circuit precedent to look at it this way because there isn't a case in which the Ninth Circuit has really squarely confronted that question of, if something is constitutionally prohibited, can you protect or can you just outright prohibit it? Well, is it really outright prohibited? Because if you prohibited a person from having more than 10 rounds of ammunition, that would be a prohibition. In this case, all you're prohibiting is over 10 rounds in a magazine because you can have multiple magazines. There's no cap at all on how many rounds of ammunition you can have. Sure. But I think it still is a prohibition because I think whether you want to think of it as a magazine with a capacity of more than 10 rounds is that constitutionally protected? Or the other way to think about it would be, is a firearm that's capable of firing more than 10 rounds without reloading constitutionally protected? I think either way you come at that question, the answer has to be yes because that is the kind of arms that are commonly owned by law-abiding individuals for lawful purposes. So to say, well you can have as many 10-round magazines as you want is just to say you can't have a firearm with a firing capacity of more than 10 rounds without reloading. And if the constitution entitles you to possess, to keep and bear a firearm with a firing capacity of more than 10 rounds without reloading, then this is an outright ban on the ability of law-abiding citizens to continue to possess that kind of firearm. Can you address Chief Judge Lynn's question to I think the Appellant's Council that had to do with, all right, what do we do with the record that we have before us? What do we have to do? Do we have to look at everything and make our own conclusions anew or is there any deference to the district court or what's your view of that? Yeah, sure. I mean I don't think it's at all the case that the district court, it's just as if the district court never decided this. I mean the ultimate legal issue is a de novo question, but the district court did what district courts do, weighed the evidence, determined what was more reliable, what was more credible, and I don't think that in this context or any other constitutional context that you just throw all that out the window and you have to do de novo review of the evidentiary record and second guess things like was the district court correct in looking at this and saying that while the state may at best have proven correlation, it didn't prove causation, a causal relationship between these things, or correct in concluding that the evidence just didn't meet the state's burden of demonstrating that this is something that's going to actually further that interest. I don't think it's really this court's job to completely start from scratch on all of that. I think the right way to look at it is through the typical kind of clearly erroneous framework for the actual kind of factual findings that the court made and then, of course, review the ultimate analysis of in light of how the court resolved various issues. Did the de novo question of did all of that evidence suffice to meet the state's burden? I think that's the right way to come at it, but ultimately I also think the district court analyzed this question in many different ways and said whether I look at it through this lens, through this lens, through strict scrutiny, through intermediate scrutiny, whether I look at the evidence and credit this or not, I keep coming to the same conclusion. And I think that's correct here, too, in that even if you want to grant the state that they've, even if you wanted to say the law furthered the state's interest, which I don't think the state met its burden of demonstrating, the state would still have this fit problem. It just doesn't have any way to say that obliterating the right to possess a magazine with more than 10 rounds with a capacity of more than 10 rounds is kind of a way of addressing this problem that is respectful of and doesn't unnecessarily abridge the constitutional right to possess magazines with a capacity of more than 10 rounds. Can you address the counsel for the appellant's discussion regarding the pause issue with changing, you know, that that would go to, that I could have three 10 magazines all lined up next to my gun. I could have it loaded and I could have three by that. How does that correlate with the evidence and also with, but my gun, the gun that I lawfully bought was one with a 17 round. Right, and this is exactly where, you know, I think the ultimate conclusion  is that what the state had demonstrated was correlation, at most correlation, but not causation, because, you know, even if, basically what the state's evidence continuously, what they're, what it, taken in its best light, the state's evidence is saying that there is a higher level, you know, there's greater lethality or perhaps more shots or, you know, and then some sort of eyewitness accounts that perhaps suggest that maybe people were able to escape during pauses. And the district court looked at all of that and said, first off, I am finding, after reviewing all the evidence and the other sides, you know, reviewing our experts and what they said about selection bias in terms of what was being looked at, it wasn't clear that this was really a representative sample. And then saying, you know, and kind of what's being relied on to say that pauses made critical differences is really not, kind of, something that is reliable in and of itself. We just don't know and we just don't have any basis to kind of draw this causal connection instead of just correlation. And I would note, you know, this is really very much the distinction that the state's own evidence, state's own expert, Dr. Cooper, back in the day, made about the 1994 federal assault weapon and magazine ban by saying, look, yes, as might happen when there's fewer things available, they are used less frequently in crime, but the relevant question, whether there was less crime or less lethality when firearms were used in crime, was exactly what he said the evidence didn't support. And in the past, you know, in the kind of decade and a half since then, and in the five years since the FIOC case, this is one of the things that I think makes the record different, is that attention has been focused on that question and saying, okay, let's really drill down on this and determine whether that causal relationship has been proven. And the district court, after reviewing, you know, an immense record here and holding an extensive hearing and hearing from both sides on everything, on all of these issues, decided that the state's evidence just didn't meet its burden. And I don't think that FIOC or anything else compels this panel to reach a different conclusion or to reweigh all of that evidence itself. Let me ask you about this. I want to go to the takings argument. So, if we, if, hypothetically, if we were to affirm the district court on the Second Amendment grounds, do we need to reach the takings argument? You don't need to reach the takings argument. It really only matters if the court doesn't affirm the determination that the ban is a constitution. But, it seems to me that the takings claim, the district court, it, the district court really focused on the Second Amendment. And it seems to me that the district court conducted, perhaps, a rather cursory review on the analysis on the takings. So, if we got to that, do you think that the issue would require a further fact-finding and record development? I have a little bit of a problem with the record here. Yeah. No, I don't think it would because I appreciate that there are record-based questions left. But I think all of those questions are really questions about what compensation would be due, not about the legal question of whether this constitutes a taking. And on that legal question, you know, first I want to just make one thing clear. I mean, you know, we agree with the state that the takings argument only matters as to the grandfathering clause. We're not here arguing a taking on behalf of people who don't presently possess a magazine. So, the takings argument is focused on that confiscatory aspect of the ban that is saying, as do people who presently lawfully possess a magazine, they have to dispossess themselves of that magazine. And I think, as her question was... Let me interrupt just a minute. I want to make sure I understand that. Sure. And do you include within dispossession having your magazines modified? I do. I think the better way to think about that is as dispossession because, you know, as Judge Callahan was suggesting earlier, I mean, you're being told, like, I can't continue to possess my 17-round magazine. If I convert it to something else, I can possess it, but I can't possess this. And that's, to me, exactly what the Supreme Court was talking about in Horn when it rejected the federal government's argument that, oh, this isn't a taking because you could just convert your grapes into wine instead of raisins and then you'd be able to keep them. And the court said, property rights aren't that manipulable if you can't keep what it is that you have, then, you know, then there's a physical taking. And to me, you know, I mean, I think a potentially helpful analogy is, I mean, if instead of the state saying, you know, you have to destroy it, they said, you have to come surrender your 17-round magazine and we'll exchange it for a 10-round magazine. Now, it might be relevant to the question of compensation, but I don't think there'd be any doubt that there was a taking when you had to surrender that 17-round magazine and exchange it for something else. So, you know, I appreciate that this record doesn't answer the question of what compensation would be due if the state wants to proceed with the confiscatory aspects of this ban even on notice that it would have to pay just compensation. But, as the Supreme Court recently made clear in the Nick case, there's a taking as soon as the property is taken without just compensation.  is complete whether or not, you know, the compensation is just the remedy. So, I think the right, if this court reaches the takings question, I think that the right thing for you to do is to decide whether this is a taking. And, you know, perhaps then, I mean, I think the right thing to do would be to give the state the option to decide now that you know you have to pay compensation, do you want to continue to have a confiscatory law on the books? And if they do, then the question of compensation would get worked out down the line. There's no... Do any of my colleagues have additional questions? All right. Since I try to make an effort to equalize time as well, so if you want to use two minutes to wrap up anything we haven't asked you, counsel, you can do that and then I'm going to go back in three minutes rebuttal to appellant's counsel. If you had anything else. Yeah, I'll just make one final point on the takings piece. I mean, you know, the state's principal argument here is that there's no taking at all because it asserted its police power. And I just don't think that that squares with the constitution, with the doctrine in this area at all. That's exactly the argument that the Supreme Court rejected in Lucas. And while Lucas did note that the analysis might play out a little bit differently in a personal property case, all it was saying was when you apply the regulatory or physical takings principles in the personal property case, sometimes it might be harder to prove a taking. But here where you have dispossession, there's just no support for this historical notion that if you dispossess people of their property entirely, that you can get out of paying just compensation if you call it nuisance law or something. That's exactly the argument that Lucas rejected. And it seems quite extraordinary to me to think that you could just absolutely take people's property, physical or personal or real, without paying any compensation at all. But I think it would be just particularly extraordinary if that law was somehow kind of relaxed or loosened or even easier to get out of paying just compensation when what you're dealing with is the one form of property that the Constitution specifically singles out as something that the people have a constitutional right to keep and bear. So in a sense, the takings issue just kind of reinforces the Second Amendment conclusion and given that we are talking about something that satisfies the Heller test of being commonly owned by law-abiding citizens for lawful purposes like self-defense, the state just cannot employ the draconian option of absolutely prohibiting these types of magazines. If there's no other questions, we would ask you to affirm. Thank you. Thank you, Counsel. All right, Mr. Echevarria, you have three minutes for rebuttal. Thank you, Your Honors. I just want to address a few points. Under intermediate scrutiny, the state can rely on evidence of correlation in this case. It does not need to show causation. It can't, in some ways, show causation. We can't do scientific experiments to show that large-capacity magazines cause increased fatality counts. But the evidence shows that there is a correlation and the plaintiffs don't deny it. Is there any evidence in the record to address the grandfathering issue or the lack thereof? You know, our court and other courts have said whether there is a grandfather clause for people who have held LCMs in the past is a factor to consider. And is there, so, you know, here, if there are people who have owned LCMs for a decade, they're law-abiding citizens, and under the law, they no longer own LCMs. Is there any evidence that addresses that type of situation? Is Your Honor referring to situations where somebody has a grandfathered magazine and is using it in crime? Is that what Your Honor's concerned? Yeah, to justify the lack of grandfathering clause here. Okay, well, the State of California enhanced its restrictions by banning possession including grandfathered magazines because it can rely on any evidence reasonably believed to be relevant under this Court's precedence. And the State could look at mass shootings involving non-grandfathered large-capacity magazines to come to the conclusion that even legally possessed large-capacity magazines pose a public danger. How does that correlate to that? I'm law abiding and I've had this 17, I have this LCM and I've had it for, you know, 20 years or whatever and I haven't committed any crimes. How does that correlate  going to be dangerous in my home in self-defense? Well, the State is not singling out any individual owners of grandfathered large-capacity magazines.   law on gun crimes and magazines can be stolen, misplaced, or misused in mass shootings or in gun crimes generally. Professor Coper notes that large-capacity magazines were used in 13 and 26 percent of all gun crimes. So there could be other benefits in addition to reducing the fatality counts in public mass shootings and violence against law enforcement. I'd also like to note about intermediate scrutiny. The State is not required to show that the law is narrowly tailored. That's language from strict scrutiny. Under this Court's intermediate scrutiny precedence, the State need only show that the important super-inclusiveness of the law does not doom a statute under intermediate scrutiny. And here there is a reasonable fit because if we only have certain use requirements on large-capacity magazines, they can still be misused and can still be used to injure or kill innocent people. Would you like to revise your comments about any factual findings that the District Court made on the record? I mean, can we just, isn't the District Court entitled, can't we rely on some of those and review them for clear error or something along those lines? Or do we just have to start over like we're the District Court? That's what you seem to imply. And that doesn't seem right to me. I don't want to say that this court can't look at the District Court and what it did. I think the District Courts generally help appellate courts even under de novo review by examining the record. But here we're not dealing with adjudicated facts like evidence in a criminal case. These are legislative facts. And this is identical to the evidence in the six other federal circuit courts that did each uphold ten round limitations in upholding the law. And the court did commit, even if a clear error standard applies, it did commit clear error by ignoring all the expert testimony. By requiring All right. I've allowed you extra time unless there are additional questions by my colleagues. I'm going to call it a day. But either Judge Lee or Judge Lynn, do you have additional questions? I have one more question. Go ahead. California is a very large state and there are people who live in rural areas, in the desert, in the mountains, and for them law enforcement may be far away. For people who live in these areas, why is this law a substantial burden on their second amendment rights? So individuals have the ability to acquire any number of ten round magazines that they need. And ten round magazines are effective in self defense, but require some tailoring regarding specific geographic regions within the state because there was no severe burden on the core right to self defense. So the relative need for more ammunition in certain areas of the state wouldn't fail in immediate scrutiny. The burden is still not severe and the evidence still justifies a ten round limit. So would your argument be different if you said that people can only, okay, not only can they not have 17, they cannot have an LCM, but they can only have two ten round magazines. Would your argument, would, because you seem to say, but since we're going to let people have as many ten rounds as they want, then they're not being severely impacted. But if you then go to, well, okay, we're only going to allow you two tens, then would that geographic argument be a better one? It might. The burden would be incrementally more severe on the core right. But there would still be 20 rounds available for self-defense in magazines. There are also other firearms that are not even touched by California's ten round limit that can be used in rural areas and urban areas alike. Shotguns, for example, other forms of long guns. So I'm not, standing here today, I'm not, I don't want to represent that strict scrutiny would apply to that kind of restriction. But the analysis might be different and there would be a different record compiled potentially. All right. Any additional questions for my colleagues? No. All right. Well that will conclude the argument. I want to thank both counsel. You are obviously both very well prepared and very helpful to the court. And we appreciate it when lawyers know their cases and are prepared like both of you were today. Thank you very much. And this will conclude our calendar and so we're now in recess. And Richard will let us know when it's just us on the line for conference. This court stands in recess until 9 a.m. tomorrow morning.
judges: Callahan, Lynn, Lee